IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL ACTION No. 08-108 |
| | : | |
| v. | : | CIVIL ACTION No. 10-3576 |
| | : | |
| LAWRENCE DELUCA | : | |

**MEMORANDUM**

**Juan R. Sánchez, J.**                                      **November 26, 2012**

Defendant Lawrence DeLuca, a prisoner in federal custody, has filed a motion to vacate sentence pursuant to 28 U.S.C. § 2255, arguing he received ineffective assistance of counsel at sentencing. The Government asks this Court to dismiss DeLuca's § 2255 motion on the ground the motion is barred by the appellate waiver provision of DeLuca's guilty plea agreement. For the reasons set forth below, DeLuca's § 2255 motion will be denied on the merits, and the Government's motion to dismiss will be denied as moot.

**FACTS**

On October 9, 2008, DeLuca pleaded guilty to one count of possession of child pornography, in violation of 18 U.S.C. § 2252(a)(4)(B), pursuant to a written guilty plea agreement. In the plea agreement, DeLuca "voluntarily and expressly waive[d] all rights to appeal or collaterally attack [his] conviction, sentence, or any other matter relating to [his] prosecution, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law." Guilty Plea Agreement ¶ 9. This broad appellate waiver provision is subject to certain limited exceptions. First, the plea agreement provides the waiver is "not intended to bar the assertion of constitutional claims that the relevant case law holds cannot be waived." *Id.* Second, the plea agreement permitted DeLuca to file a direct appeal of his sentence if the Government appealed from the sentence. *Id.* ¶ 9(a). Third, in the event the Government did not appeal, the plea

agreement permitted DeLuca to file a direct appeal raising only claims that

(1)    the defendant's sentence on any count of conviction exceeds the statutory maximum for that count as set forth in paragraph 6 above [i.e., 10 years];

(2)    the sentencing judge erroneously departed upward pursuant to the Sentencing Guidelines; and/or

(3)    the sentencing judge, exercising the Court's discretion pursuant to *United States v. Booker*, 543 U.S. 220 (2005), imposed an unreasonable sentence above the final Sentencing Guideline range determined by the Court.

*Id.* ¶ 9(b). At the change of plea hearing, this Court reviewed the terms of the guilty plea agreement, including the appellate waiver provision, with DeLuca. *See* Change of Plea Hr'g Tr. 26-30, Oct. 9, 2008 (discussion of appellate waiver). Upon finding that DeLuca was competent, his decision to plead guilty was knowingly and voluntarily entered, there was an independent factual basis for the guilty plea, and DeLuca understood the maximum penalty applicable in the case and the trial and appellate rights he was giving up by pleading guilty, this Court accepted DeLuca's guilty plea. *Id.* at 34-35.

Following DeLuca's guilty plea, the Probation Office prepared a Presentence Investigation Report (PSR) for DeLuca. Consistent with the parties' stipulations in the guilty plea agreement, the probation officer calculated DeLuca's advisory sentencing range under the federal Sentencing Guidelines as 78 to 97 months, based on a total offense level of 28 and a criminal history category of I. DeLuca does not challenge the calculation of his advisory Guidelines range.

At the request of the Probation Office, and with the parties' agreement, psychologist Timothy P. Foley, Ph.D., conducted a psycho-sexual evaluation of DeLuca as part of the presentence investigation process. Dr. Foley evaluated DeLuca for a total of five hours, examining him regarding his developmental, social, medical, psychiatric, educational/vocational, and sexual history, and

administering certain psychological tests. Foley Report 1. The tests administered by Dr. Foley included the Minnesota Multiphasic Personality Inventory–2 (MMPI–2), which tests "personality functioning and psychopathology," and the Abel Screen, which provides an objective measure of the subject's sexual interest. *Id.* at 5. According to Dr. Foley's report, the Abel Screen entails the subject viewing a series of 160 slides and rating each on a seven-point scale of sexual interest while (unbeknownst to the subject) the computer records the viewing time for each slide. *Id.* The viewing time is then analyzed to provide an objective measure of sexual interests. *Id.*

In describing the results of DeLuca's psychological testing, Dr. Foley noted that on the MMPI–2 test, DeLuca had "answered the 567 test questions in an open and honest manner, according to embedded validity indicators," and reported the test "indicat[ed] an absence of measured psychopathology." *Id.* As to the Abel Screen, Dr. Foley reported DeLuca "provided an invalid protocol for this test." *Id.* Specifically, Dr. Foley observed that while DeLuca "self-reported primary sexual attraction to postpubescent females," he "provided little viewing time variation," which "suggest[ed] that he rushed through the test and did not follow standard instructions." *Id.* Thus, although DeLuca's "objective visual reaction times indicate[d] primary interest in postpubescent females," Dr. Foley concluded the results could "[]not be reliably interpreted." *Id.*

Dr. Foley concluded his report with the following summary, recommendations, and conclusions:

**<u>Summary</u>**

Lawrence DeLuca is a 36-year-old man who has been charged with possession of child pornography. He has no known prior criminal history. There is no known history of contact sexual offenses. There is no known history of drug or alcohol abuse.

He self reports a considerable history of sexual promiscuity with apparent waning over the past several years. Mr. DeLuca indicates that he purchased access to pornography sites but stopped his subscription approximately one year before his arrest. He denied finding the prepubescent images sexually gratifying. He acknowledges the wrongfulness of his behavior and realization that he created a market for depictions of sexually abused children.

Sexual interest testing is inconclusive with an invalid protocol. Psychological testing shows a relatively well-adjusted individual with no measured psychopathology. Mr. DeLuca reports a history of compulsive counting and periodic anxiety states that do not seem to cause much distress.

### Recommendations and Conclusions

1. Mr. DeLuca is low risk for contact sexual offenses. Contact with family shows considerable opportunity to molest children with no evidence of the same. His history does not show a paraphilic disorder or propensity for antisocial behaviors. Both of these factors are considered risk indicators for sexual misconduct.

2. Mr. DeLuca should be monitored for symptoms of an anxiety disorder if he is confined. Behavioral intervention may be useful if Mr. DeLuca is motivated to address symptoms of an anxiety disorder.

3. He should be referred for psychotherapy to further investigate his index offense behavior.

*Id.* at 5-6.

Following completion of Dr. Foley's report, the probation officer revised DeLuca's PSR to incorporate Dr. Foley's findings, including his conclusion that DeLuca presented a low risk for a contact sexual offense, and his description of the limitations of DeLuca's Abel Screen results. At the request of DeLuca's counsel, this Court made Dr. Foley's report available to the parties.

Prior to sentencing, DeLuca's counsel submitted a sentencing memorandum in which counsel requested a downward variance from the advisory Guidelines range of 78 to 97 months. In support of his variance request, counsel cited DeLuca's four years of service in the United States Marine Corps, during which he received several commendations and took part in the rescue of a United

4

States Air Force Captain who had been shot down while patrolling a no fly zone over Bosnia-Herzegovina; his significant employment record; his otherwise crime-free adult life; his committed relationship with his girlfriend and their infant daughter; and Dr. Foley's conclusion that he was a low risk for a contact sexual offense.

Counsel also requested a substantial variance from the advisory Guidelines range at the June 15, 2009, sentencing hearing, at which counsel presented three witnesses and eight additional letters of support for DeLuca.[1]  In reviewing the sentencing factors set forth in 18 U.S.C. § 3553(a), the Court recognized DeLuca's exemplary military record, his stable and productive employment history, the fact he had voluntarily discontinued his offense conduct well before he was arrested and had otherwise lived a law-abiding adult life, his committed relationship with his longtime girlfriend and infant daughter, and the testimony and letters from family, friends, and coworkers describing DeLuca as a responsible, decent person.  The Court also considered Dr. Foley's report, expressing concern that DeLuca had provided an invalid protocol for the Abel Screen, rendering the test unhelpful, and expressing some skepticism of Foley's ability to foresee future criminal behavior. Sentencing Tr. 49-50, June 15, 2009 (remarking, "I cannot understand how the doctor would be able to foresee future criminal behavior because the best indicator[] of future criminal behavior is past criminal behavior and certainly, this case is troubling to the Court").  Although noting DeLuca had many characteristics "which we hope will make him a candidate for full rehabilitation," upon

---

[1] Defense counsel presented testimony from DeLuca's older sister, whose young daughters DeLuca often cared for while their parents were working; from a former coworker of DeLuca; and from a former girlfriend who continued to maintain a friendship with DeLuca.  All three witnesses testified regarding DeLuca's caring and compassionate nature, willingness to help others, and strong work ethic.  Counsel also presented the Court with letters of support for DeLuca from eight friends, family members, and former coworkers.

consideration of all of the § 3553(a) factors, the Court denied DeLuca's variance request, finding a downward variance was not warranted "[g]iven the seriousness of the offense," which involved more than 2,000 images and five videos containing child pornography created through the sexual abuse and exploitation of minors. *Id.* at 50; *see also id.* at 47. The Court nevertheless found the factors cited by DeLuca's counsel suggested a sentence at the bottom of the advisory Guidelines range. Accordingly, the Court sentenced DeLuca to 78 months of imprisonment, 10 years of supervised release, a fine of $1,000, and a $100 special assessment. Judgment was entered in the case on July 21, 2009.

On July 22, 2010, DeLuca, represented by new counsel, filed the instant § 2255 motion, arguing he received ineffective assistance of counsel at sentencing. DeLuca contends his counsel was ineffective for failing to conduct any further investigation or follow-up after receiving the results of Dr. Foley's psycho-sexual evaluation. DeLuca argues his counsel should have (1) discussed the results of the evaluation with Dr. Foley to understand the significance of the inconclusive Abel Screen results and asked Foley to readminister the Abel Screen and to testify at the sentencing hearing, and (2) obtained a psychological or psychiatric opinion—from Dr. Foley or another professional—as to the reason DeLuca committed the offense. DeLuca alleges he was prejudiced by his counsel's deficient performance in that, had counsel taken the steps DeLuca contends he should have taken, this Court would have been presented with evidence—from Dr. Foley and other sources—that certain previously unidentified, treatable psychiatric disorders contributed to his offense behavior and that DeLuca was in fact at very low risk for reoffending. In support of this argument, DeLuca has submitted declarations from Dr. Foley explaining, *inter alia*, he did not believe DeLuca had intentionally failed to follow the instructions for the Abel Screen, the Abel

Screen is not a good predictor of future criminality, and he was confident DeLuca posed a very low risk of reoffending, even without valid Abel Screen results. DeLuca also has submitted a more recent psychiatric evaluation completed by Susan J. Fiester, M.D., who believes DeLuca suffers from several previously undiagnosed psychiatric disorders the symptoms of which "helped drive his criminal behavior,"[2] and who echoes Dr. Foley's conclusion that DeLuca "is at low risk of reoffending in the future." Fiester Report 12-14. DeLuca contends there is a reasonable probability that, had this Court considered this evidence, it would have imposed a sentence below the advisory Guidelines range of 78 to 97 months.

In February 2011, the Government filed a motion to dismiss DeLuca's § 2255 motion, arguing DeLuca's motion is barred by the appellate waiver provision in his guilty plea agreement. DeLuca opposes the motion to dismiss, arguing the waiver cannot be enforced because it was not knowing and voluntary, because it cannot apply to an ineffective assistance of counsel claim against the same lawyer who advised him regarding the waiver, and because enforcement of the waiver as to such a claim would work a miscarriage of justice.

In July 2012, this Court directed the Government to respond to DeLuca's § 2255 motion on the merits. The following month, this Court heard oral argument on the Government's motion to dismiss and on the merits of DeLuca's § 2255 motion.

## DISCUSSION

A criminal defendant "may waive both constitutional and statutory rights," including the right to appeal or to collaterally challenge his sentence, provided the waiver is entered into "voluntarily

---

[2] Specifically, Dr. Fiester believes DeLuca suffers from Bipolar Disorder NOS, Attention-Deficit/Hyperactivity Disorder, Learning Disorders, Panic Disorder, and Social Phobia. Fiester Report 12.

and with knowledge of [its] nature and consequences." *United States v. Mabry*, 536 F.3d 231, 236 (3d Cir. 2008). A waiver of collateral review rights, if entered into knowingly and voluntarily, is valid and enforceable unless enforcement of the waiver would work a miscarriage of justice. *See id.* at 244. When the Government invokes a waiver of collateral review rights to bar review of the merits of a defendant's claims, a court must consider (1) whether the waiver was knowing and voluntary; (2) "'whether one of the specific exceptions set forth in the agreement prevents the enforcement of the waiver;' *i.e.*, what is the scope of the waiver and does it bar . . . review of the issue pressed by the defendant"; and (3) "'whether enforcing the waiver would work a miscarriage of justice.'" *United States v. Goodson*, 544 F.3d 529, 536 (3d Cir. 2008) (quoting *United States v. Jackson*, 523 F.3d 234, 243-44 (3d Cir. 2008)). DeLuca argues all three considerations weigh against enforcing the waiver in this case.

DeLuca first argues his waiver of collateral review rights was not knowing and voluntary because his counsel's explanation of the waiver was incomplete and the explanation provided by this Court during the plea colloquy did not fill the gaps in his understanding.[3] Specifically, DeLuca asserts that in discussing the waiver with him, his counsel explained the provision meant DeLuca "would not be able to withdraw [his] guilty plea and have a trial" and "would not be able to appeal any errors the court might make in sentencing [him]," but did not explain the waiver would also prevent him from obtaining relief in the event his counsel "provided [him] with substandard representation at sentencing." DeLuca Decl. ¶ 6; *see also* Def.'s Resp. to Gov't's Mot. to Dismiss 5. While DeLuca acknowledges this Court also reviewed the waiver with him at the change of plea

---

[3] DeLuca does not contend his plea was coerced in any way, and he stated on the record at the change of plea hearing that his guilty plea was not the product of any threats, promises, or inducements, but was entered of his own free will. Change of Plea Hr'g Tr. 9-10.

hearing, he contends the further explanation provided by the Court did not correct his counsel's limited explanation, as the Court "never explained to [him] that his plea agreement would prevent him from obtaining relief even if there turned out to be a reasonable probability that the sentence he eventually received was longer than it would have been as a result of deficient legal representation at sentencing." Def.'s Resp. to Gov't's Mot. to Dismiss 5-6.

A defendant challenging the knowing and voluntary character of a collateral review waiver "bears the burden of presenting an argument that would render his waiver unknowing or involuntary." *Mabry*, 536 F.3d at 237. DeLuca has presented such an argument here, having submitted a declaration in which he states he did not understand the full scope of the waiver because of the limited explanation provided by his counsel. In addition to DeLuca's allegations, however, this Court must consider the language of the waiver and the discussion of the waiver during the change of plea hearing, as even affirmatively erroneous sentencing information provided by defense counsel will not render a guilty plea unknowing or involuntary where the erroneous information is corrected by the written plea agreement and the in-court colloquy.[4] *See United States v. Sabater*, 270 F. App'x 219, 221 & n.1 (3d Cir. 2008) (holding defendant voluntarily, knowingly, and intelligently waived his appellate rights in his guilty plea agreement, notwithstanding defense counsel's assertion he had told defendant he retained the right to appeal, where district court specifically questioned defendant on his understanding of the appellate waiver and explained the ramifications of the waiver during plea colloquy); *United States v. Robinson*, 244 F. App'x 501, 503 (3d Cir. 2007) (finding

---

[4] DeLuca does not contend his counsel affirmatively misrepresented that he would be permitted to challenge counsel's performance at sentencing, notwithstanding the waiver. Rather, he asserts his counsel failed to specifically explain that a claim of ineffective assistance of counsel at sentencing was among the claims he was waiving. *See* DeLuca Decl. ¶ 6.

collateral review waiver was knowing and voluntary, notwithstanding defendant's allegation his trial counsel failed to properly explain waiver, where the record as a whole, including the guilty plea colloquy and the wording of the plea agreement, refuted defendant's argument); *cf. United States v. Shedrick*, 493 F.3d 292, 299 (3d Cir. 2007) (holding "an erroneous sentencing prediction by counsel is not ineffective assistance of counsel where . . . an adequate plea hearing was conducted").

As noted, the language of the appellate waiver provision in DeLuca's guilty plea agreement is extremely broad. In it, DeLuca agreed to "voluntarily and expressly waive[] *all* rights to appeal or collaterally attack [his] conviction, sentence, or *any other matter relating to this prosecution*, whether such a right to appeal or collateral attack arises under 18 U.S.C. § 3742, 28 U.S.C. § 1291, 28 U.S.C. § 2255, or any other provision of law," subject to certain narrow exceptions. Guilty Plea Agreement ¶ 9 (emphasis added). The breadth of the waiver undermines DeLuca's claim he did not understand the waiver to encompass claims of ineffective assistance of counsel at sentencing. Nevertheless, because DeLuca argues his counsel did not explain that the waiver included such claims, this Court will examine the discussion of waiver at the change of plea hearing to determine whether the full scope of the waiver was adequately conveyed to DeLuca at the hearing.

At the change of plea hearing, this Court reviewed the appellate waiver provision of DeLuca's guilty plea agreement with him in some detail. Directing DeLuca's attention to the waiver itself (¶ 9 of the agreement), the Court first confirmed DeLuca understood

> that by pleading guilty, you voluntarily and expressly give up all rights to appeal or to attack your conviction, sentence or any matter relating to the prosecution of this case, whether such right to appeal or attack arises under these provisions of the law [i.e., 18 U.S.C. § 3742, 28 U.S.C. § 1291, or 28 U.S.C. § 2255] or any other provision of law.

Change of Plea Hr'g Tr. 26. The Court further explained the waiver provision meant "that by

pleading guilty you're significantly limiting your appellate rights," *id.* at 27, and went on to provide

examples of the types of issues DeLuca would be able to raise on direct appeal and on collateral

review if he went to trial:

> THE COURT:  And for example, if you were to go to trial—you're not going to trial—but if you were to go to trial and I'd made errors in admitting evidence or in excluding evidence in the case and you believed that those errors impacted the verdict, you could raise that on appeal—on direct appeal—do you understand that?

> THE DEFENDANT:  Yes, sir.

> THE COURT:  And even if you lost that and you believed that during the conduct of the trial, you were not adequately represented or things happened in—in the trial . . . you could later on bring collateral proceedings—separate proceedings. For example, saying that my lawyer did not do a good job or he did not represent me effectively as the Constitution requires that I be given effective representation; do you understand?

> THE DEFENDANT:  Yes, sir.

*Id.*  The Court then explained the impact of the waiver on DeLuca's ability to raise these types of

issues:

> THE COURT:  This [i.e., the waiver] basically means that you give up those rights to later challenge your lawyer's stewardship of the case and to set aside any—to vacate the sentence or set aside or correct any sentence; do you understand?

> THE DEFENDANT:  Yes sir.

*Id.*[5]

---

[5] DeLuca asserts he understood this exchange to relate only to the rights he was giving up by not going to trial, as opposed to the rights he was giving up in the waiver itself.  *See* DeLuca Decl. ¶ 8; Def.'s Resp. to Gov't's Mot. to Dismiss 6-7.  In other words, while acknowledging he understood from the above exchange that if he had gone to trial he would have had the right to challenge his lawyer's stewardship of the case in collateral proceedings and the waiver meant he was giving up this right, DeLuca nevertheless contends he did not understand the waiver to mean he was also giving up the right to challenge his lawyer's stewardship of the case in the event he did not go to trial.  He also contends this understanding is consistent with his counsel's explanation that the waiver meant he would not be able to withdraw his guilty plea and have a trial, i.e., that he was giving up

The Court also reviewed with DeLuca the limited circumstances in which he would be permitted to file an appeal, and then asked DeLuca

> But do you understand that although you will be sentenced after a very careful consideration of the guidelines that we've talked about and unless there is an error which results in a miscarriage—a miscarriage of justice, you will not have the right to challenge any appeal or attack—or attack the sentence that I give you under the guidelines; do you understand?

Change of Plea Hr'g Tr. 28. DeLuca confirmed he understood. *Id.*

In addition to addressing DeLuca's direct appeal rights, this Court also explained the impact of the waiver on DeLuca's ability to seek collateral review via a § 2255 motion. The Court explained habeas corpus, codified in the federal system in § 2255, is

> a right after a direct appeal has been denied, you go up to the highest court in the land and it's denied, you, for example, can raise that your lawyer was ineffective—I just mentioned that a few minutes ago—or that other collateral issues should have been raised at the time that you filed your direct appeal and you should be able to attack your conviction; do you understand?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: So, because you are waiving your right to appeal, that covers not only your direct appeal right, but also your right to file a federal *writ of habeas corpus* under Section 2255; do you understand that?
>
> THE DEFENDANT: Yes, sir.
>
> THE COURT: Put in other words, you have agreed in this agreement, that ultimately, you will not raise any appeal issues concerning the advisory nature of the sentencing guidelines or sentencing calculations or any other collateral issue to this case; do you understand that?
>
> THE DEFENDANT: Yes, sir.

---

protections he would otherwise have enjoyed had he gone to trial. *See* DeLuca Decl. ¶ 8. This Court need not decide whether DeLuca's understanding of the above exchange is plausible because the plea colloquy as a whole makes clear it was adequately explained to DeLuca the waiver would preclude him from raising a claim of ineffective assistance of counsel on collateral review.

THE COURT:  Do you have any questions about that?

THE DEFENDANT:  No, sir.

*Id.* at 29-30.

Focusing on this Court's description of a § 2255 motion as a mean of attacking a *conviction*, *id.* at 29, DeLuca argues he understood from the Court's explanation that he was giving up the right to challenge his conviction, including on grounds of lawyer ineffectiveness, via a § 2255 motion, but did not understand he was giving up the right to collaterally challenge his sentence on such grounds. DeLuca Decl. ¶ 9.  Although DeLuca argues he could not be expected to have understood from the Court's explanation that he would not be able to challenge his sentence, DeLuca concedes his own attorney explained the waiver encompassed sentencing issues, preventing him from "appeal[ing] any errors the court might make in sentencing me."  *Id.* ¶ 6.  Moreover, DeLuca's narrow focus on this Court's use of the term "conviction" in describing § 2255 ignores the Court's earlier explanation of collateral proceedings as an opportunity to challenge his lawyer's stewardship of the case as a basis "to vacate the sentence or set aside or correct any sentence."  Change of Plea Hr'g Tr. 27; *see also id.* at 29 (explaining waiver meant DeLuca agreed not to raise any collateral issues, including sentencing issues).

At the change of plea hearing, DeLuca stated he understood the waiver extended to his direct appeal rights as well as his right to file a § 2255 motion, and encompassed challenges to his sentence as well as his conviction.  *Id.* at 26, 29.  DeLuca also stated he understood that claims of lawyer ineffectiveness were among the claims he was waiving by virtue of his waiver of collateral review rights.  *Id.* at 19, 27.  These "[s]olemn declarations in open court carry a strong presumption of verity," *Blackledge v. Allison*, 431 U.S. 63, 74 (1977), and refute DeLuca's claim he did not

understand he was waiving his right to challenge his counsel's ineffectiveness at sentencing. Because the record as a whole amply demonstrates the waiver was knowing and voluntary, this Court rejects DeLuca's allegations to the contrary. *See Sabater*, 270 F. App'x at 221 & n.1 (concluding defendant's waiver of appeal was "voluntarily, knowingly and intelligently made" based on explanation of waiver provided at change of plea hearing notwithstanding defense counsel's assertion that he had advised defendant he retained the right to pursue an appeal); *Robinson*, 244 F. App'x at 503 (finding record of plea colloquy and wording of plea agreement "sufficient to establish that the [appellate] waiver was knowing and voluntary despite [defendant's] attempts to disavow it"); *United States v. Sabater*, No. 05-433, 2010 WL 2891510, at *2 & n.2 (M.D. Pa. July 21, 2010) (finding defendant's allegations regarding his attorney's assurance he would be able to file an appeal after sentencing and regarding his attorney's failure to explain appellate waiver to him insufficient to show waiver was unknowing or involuntary where written plea agreement and in-court colloquy showed otherwise), *aff'd*, 441 F. App'x 68 (3d Cir. 2011); *cf. United States v. Jefferson*, 63 F. App'x 439, 443-44 (10th Cir. 2003) (rejecting defendant's argument that because the district court advised him he was waiving his right to collaterally challenge only his conviction, the waiver was unenforceable as to a challenge to his sentence where the plea agreement itself stated defendant was waiving his right to appeal or collaterally challenge his sentence).

DeLuca also argues that even if the waiver was knowing and voluntary, this Court may nevertheless reach the merits of his claim of ineffective assistance of counsel at sentencing for two related reasons. First, DeLuca argues the waiver does not apply to this claim, citing the provision in the plea agreement that the waiver does not apply to "constitutional claims that the relevant case law holds cannot be waived." Guilty Plea Agreement ¶ 9. DeLuca argues this provision necessarily

exempts from the waiver claims of ineffective assistance by the lawyer who advised him regarding the plea agreement because that lawyer had a conflict of interest in advising him regarding the waiver of ineffective assistance claims. DeLuca contends that interpreting the plea agreement to insulate his plea counsel from ineffective assistance claims would call into question the validity of the agreement because, under such an interpretation, he would have entered the plea agreement without the advice of independent, conflict-free counsel and could not validly have waived any rights. Second, DeLuca argues enforcing the waiver would result in a miscarriage of justice because the waiver was the product of ineffective assistance of counsel in that his attorney had an actual conflict of interest with respect to the waiver.

Although "[t]he case law is sparse as to what constitutes a constitutional claim that cannot be waived," this exception appears to be "subsumed by the miscarriage of justice exception to the enforceability of a waiver." *United States v. Ladner*, No. 10-4549, 2012 WL 2402559, at *3 (3d Cir. June 27, 2012). In other words, constitutional claims that cannot be waived, even when the waiver is knowing and voluntary, are those claims alleging "error[s] amounting to a miscarriage of justice." *United States v. Khattak*, 273 F.3d 557, 562-63 (3d Cir. 2001) (declining to "earmark specific situations" in which a defendant may appeal notwithstanding an otherwise valid appellate waiver in favor of an approach that turns on whether the underlying error would work a miscarriage of justice). Thus, in evaluating both of DeLuca's arguments against enforcing the collateral review waiver in this case based on his plea counsel's conflict of interest, the relevant question is whether enforcement of the waiver in the circumstances of this case would work a miscarriage of justice.

In determining whether denying collateral review in a particular case would result in a miscarriage of justice, a court is guided by such considerations as "the clarity of the error, its gravity,

its character (e.g., whether it concerns a fact issue, a sentencing guideline, or a statutory maximum), the impact of the error on the defendant, the impact of correcting the error on the government, and the extent to which the defendant acquiesced in the result." *Mabry*, 536 F.3d at 242-43 (quoting *United States v. Teeter*, 257 F.3d 14, 25-26 (1st Cir. 2001)). Applying this framework, the United States Court of Appeals for the Third Circuit has held it would work a miscarriage of justice to enforce a collateral review waiver as to a claim counsel was ineffective in connection with the defendant's guilty plea. *See Shedrick*, 493 F.3d at 298 (holding enforcing a collateral attack waiver as to a defendant's claims his attorney's constitutionally deficient lawyering prevented him from understanding his plea would result in a miscarriage of justice); *see also United States v. Calcagni*, 441 F. App'x 916, 918 (3d Cir. 2011) (holding claim that defense counsel rendered ineffective assistance at change of plea hearing could not be waived). Here, DeLuca argues his collateral review waiver was the product of ineffective assistance because of his counsel's conflict of interest, thereby rendering the waiver unenforceable as to his underlying claim of ineffective assistance of counsel at sentencing.

A defendant seeking to establish ineffective assistance of counsel based on his attorney's "breach of the duty of loyalty and failure to avoid conflicts of interest" must show his counsel had an actual conflict of interest that adversely affected the lawyer's performance. *Gov't of the V.I. v. Zepp*, 748 F.2d 125, 132-134 (3d Cir. 1984). "Unlike the case in which a defendant argues only that counsel pursued flawed trial strategies, if the accused shows that an actual conflict of interest tainted counsel's performance," prejudice will be presumed. *Hess v. Mazurkiewicz*, 135 F.3d 905, 910 (3d Cir. 1998); *see also Zepp*, 748 F.2d at 134. Here, DeLuca argues his plea counsel had an actual conflict of interest with respect to the waiver because he stood most to benefit from it since

ineffective assistance of counsel is the most common issue raised on collateral review. DeLuca also contends this actual conflict adversely affected his counsel's performance in that counsel never advised DeLuca the waiver would insulate counsel from future ineffectiveness claims.

In support of his argument that his attorney had an actual conflict of interest with respect to the waiver, DeLuca relies on a series of state bar ethics opinions concluding a criminal defense attorney may not ethically advise a client regarding the waiver of claims of defense counsel's own ineffectiveness. *See* Advisory Comm. of the S. Ct. of Mo., Formal Op. 126 (May 19, 2009); Ohio Bd. of Comm'rs on Grievances & Discipline, Op. 2001-6 (Dec. 7, 2001); Vt. Bar Ass'n, Advisory Ethics Op. 95-04 (1995); N.C. State Bar, RPC 129 (Jan. 15, 1993). These opinions have reasoned such advice would violate state ethics rules, either because of the risk the lawyer's advice would be materially limited by his personal interest in avoiding ineffective assistance of counsel claims or because such advice would run afoul of the prohibition against lawyers attempting to limit their liability for personal malpractice.[6] Since DeLuca filed his § 2255 motion, bar ethics committees in at least four additional states have issued opinions taking a similar view. *See* Fla. Bar Prof'l Ethics Comm., Proposed Advisory Op. 12-1 (June 22, 2012); Nev. Standing Comm. on Ethics & Prof'l Responsibility, Formal Op. No. 48 (Oct. 27, 2011); Va. State Bar, Legal Ethics Op. 1857 (July 21,

---

[6] Although the specific wording of the ethics rules addressed in these opinions varies somewhat from state to state, the rules generally prohibit a lawyer from (1) representing a client if there is a significant or substantial risk the representation will be materially limited by a personal interest of the lawyer, and (2) making an agreement that prospectively limits the lawyer's liability for malpractice or attempting to exonerate himself from personal malpractice. The Pennsylvania Rules of Professional Conduct include both of these prohibitions. *See* Pa. R. Prof'l Conduct 1.7(a)(2) (providing a representation involves a concurrent conflict of interest and is therefore prohibited, subject to certain exceptions, if "there is a significant risk that the representation of one or more clients will be materially limited . . . by a personal interest of the lawyer"), 1.8(h) (prohibiting a lawyer from "mak[ing] an agreement prospectively limiting the lawyer's liability to a client for malpractice unless the client is independently represented in making the agreement").

2011); Ala. State Bar, Ethics Op. RO 2011-02 (2011). Two states have taken a different view. *See* Tex. S. Ct. Prof'l Ethics Comm., Op. No. 571 (May 2006) (concluding the Texas ethics rules do not prohibit a defense attorney from advising the defendant with respect to a plea agreement containing a waiver of post-conviction ineffective assistance of counsel claims, so long as the agreement is not treated as an agreed limitation on possible future malpractice claims and so long as defense counsel has no cause for reasonable concern about his effectiveness); Ariz. State Bar, Ethics Op. 95-08 (Nov. 1995) (opining a plea agreement waiving future ineffective assistance of counsel claims does not constitute an improper attempt to prospectively limit defense counsel's malpractice liability).

Although the Pennsylvania Bar has not addressed this issue, there appears to be an emerging trend among state bar ethics committees to recognize a criminal defense lawyer's personal interest in avoiding ineffective assistance of counsel claims may create a conflict of interest for the lawyer in advising his client regarding a plea agreement that would waive such claims. These ethics opinions do not purport to address the legality or enforceability of waivers of ineffective assistance of counsel claims, in some instances recognizing these issues are for the courts. *See* N.C. State Bar, RPC 129 (commenting "[w]hether a plea agreement is constitutional and otherwise lawful is a question to be determined by the courts"). This Court has found scant case law addressing ineffective assistance of counsel claims predicated upon defense counsel's asserted conflict of interest in advising a defendant regarding a collateral review waiver. In a few cases, courts have characterized defense counsel's putative conflict in such circumstances as "theoretical" or "speculative," *see Washington v. Lampert*, 422 F.3d 864, 873 (9th Cir. 2005); *United States v. Wells*,

97 F.3d 1463 (9th Cir. 1996) (unpublished table decision),[7] but these cases do not take into account the state bar ethics opinions to the contrary, many of which were decided only in the past two years.[8] Although the Government urges this Court to likewise hold any conflict of interest in this case was merely speculative, the weight of ethics opinions to the contrary gives this Court pause in doing so. *Cf. Watson v. United States*, 682 F.3d 740, 744 (8th Cir. 2012) (declining to decide whether a collateral review waiver that expressly encompassed ineffective assistance of counsel claims would be enforceable in light of ethics opinions regarding defense counsel's conflict of interest with respect to such a waiver, which had not been addressed by the parties). Moreover, this Court need not decide this issue because, even assuming DeLuca could show his collateral review waiver was the product of ineffective assistance of counsel, rendering the waiver unenforceable, the Court finds

---

[7] *Accord Branks v. United States*, Nos. 09-431 & 11-438, 2012 WL 206969, at *10-11 (M.D. Fla. Jan. 24, 2012) (holding defendant failed to show her attorney had an actual conflict of interest with respect to plea agreement containing a waiver of collateral review rights); *Sunderland v. Smith*, No. 08-158, 2010 WL 530063, at *6 (D. Idaho Feb. 9, 2010) (holding "theoretical" conflicts of interest, which do not rise to the level of a Sixth Amendment violation, include, *inter alia*, "where trial counsel advises a client to plead guilty while waiving any post-conviction right to appeal ineffective assistance of counsel claims," citing *Washington v. Lampert*, *supra*).

[8] In *United States v. Stevens*, 813 F. Supp. 2d 758, 770 (W.D. Va. 2011), *appeal dismissed*, 466 F. App'x 198 (4th Cir. 2012), the district court did consider a recent Virginia State Bar ethics opinion in evaluating the defendant's claim his counsel was ineffective in advising him regarding his plea agreement and the waiver of collateral review rights contained therein. Without specifically addressing whether defense counsel had an actual conflict of interest with respect to the waiver, the court held the defendant had not shown counsel had acted unethically since the ethics opinion stated a defense attorney could not ethically advise a client to *accept* a collateral review waiver encompassing ineffective assistance claims but did not specifically bar an attorney from advising a client *about* such a provision. *Id.* The court also rejected the defendant's ineffective assistance claim because the defendant had produced no evidence showing counsel's asserted conflict of interest adversely affected his representation of defendant. *Id.* (finding "no evidence that [defense counsel] advised [defendant] to plead guilty in order to do as little legal work as possible or in order to insulate himself against claims of ineffective assistance"). Here, DeLuca argues his plea counsel's conflict prevented counsel from explaining the full scope of the waiver to him.

DeLuca's claim he received ineffective assistance of counsel at sentencing lacks merit.

To establish a claim of ineffective assistance of counsel, a convicted defendant must show (1) "counsel's performance was deficient," and (2) "the deficient performance prejudiced the defense." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). To establish the deficiency element, the defendant must demonstrate "counsel's representation fell below an objective standard of reasonableness," which requires "showing that counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Id.* at 687-88. In evaluating counsel's performance, the court must be "highly deferential," making "every effort . . . to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Id.* at 689. To establish the prejudice element, the defendant must show "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. Although the reasonable probability standard does not require the defendant to show counsel's deficient performance "more likely than not altered the outcome," it is not enough "to show that the errors had some conceivable effect on the outcome of the proceeding." *Id.* at 693. Rather, "[a] reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

DeLuca argues his counsel's performance fell below an objective standard of reasonableness when counsel failed to conduct additional investigation upon receiving the report of Dr. Foley's psycho-sexual evaluation of his client. Specifically, DeLuca argues his counsel should have investigated further Dr. Foley's statement that the results of the Abel Screen administered to DeLuca were inconclusive, including asking Foley to readminister the Abel Screen to DeLuca, and should

have conducted further investigation to determine the underlying reasons why DeLuca committed his offense. In determining whether these asserted deficiencies were "outside the wide range of professionally competent assistance," this Court must assess counsel's decision not to investigate "for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Id.* at 690-91.

With respect to defense counsel's failure to follow up with Dr. Foley regarding his evaluation—and, in particular, the inconclusive Abel Screen results—the Court notes, as an initial matter, that Foley's report was generally quite favorable to DeLuca. In summarizing the examination portion of the evaluation, Dr. Foley reported DeLuca appeared "very open and disclosing" during his evaluation and seemed "motivated to better understand and address behaviors leading to his arrest." Foley Report 2. Dr. Foley also recounted that DeLuca "appeared disturbed" by the realization "that children were victimized in the course of producing the pornography and that he promoted a market for it" and "expressed credible remorse for his behavior." *Id.* at 4. With regard to DeLuca's psychological testing, Dr. Foley stated DeLuca "answered the 567 [MMPI–2] test questions in an open and honest manner" and the test showed "an absence of measured psychopathology." *Id.* at 5. Dr. Foley's evaluation summary was likewise generally favorable to DeLuca, noting his lack of any known criminal history, history of contact sexual offenses, or history of drug or alcohol abuse; denial of finding prepubescent images sexually gratifying; voluntary cessation of his offense conduct approximately one year before his arrest; and acknowledgment of the wrongfulness of his behavior. *Id.* at 5-6. Moreover, Dr. Foley concluded DeLuca was "low risk for contact sexual offenses," explaining DeLuca's family history showed "considerable opportunity to molest children with no evidence of same" and that his history reflected an absence of certain risk

indicators for sexual misconduct. *Id.* at 6.

The only aspect of Dr. Foley's report that was not affirmatively favorable to DeLuca was the discussion of the Abel Screen. Even as to this test, however, Dr. Foley opined only that the test results, which indicated a "primary interest in postpubescent females," were inconclusive and could not be "reliably interpreted." *Id.* at 5. Although Dr. Foley suggested DeLuca appeared to have rushed through the test and not to have followed the standard instructions, there is no indication he believed DeLuca did so deliberately, and, in fact, his description of DeLuca as "open and disclosing" and as having answered the MMPI–2 test questions "in an open and honest manner" suggest to the contrary. *See id.* at 2, 5. Moreover, notwithstanding the inconclusive Abel Screen results, Dr. Foley nevertheless concluded DeLuca was a "low risk for contact sexual offenses" based on other factors, including the lack of any prior molestation of children despite opportunities to do so and the fact his history did not show a paraphilic disorder or propensity for antisocial behaviors, both risk indicators for sexual misconduct.

DeLuca argues because Dr. Foley's discussion of his Abel Screen results left unresolved whether DeLuca had a sexual interest in young children, and because the Court was likely to have questions about this issue at sentencing, counsel had an obligation to investigate the issue further and was ineffective for not doing so. *See* Def.'s Resp. to Gov't's Mot. to Dismiss 11. While it is true this Court expressed concern at the sentencing hearing that because DeLuca had provided an invalid protocol, the Abel Screen test was not helpful in shedding light on DeLuca's sexual proclivities, Sentencing Tr. 49, what transpired at sentencing is not dispositive of whether counsel's preparation was deficient. Rather, this Court must evaluate counsel's decision not to investigate Dr. Foley's findings further from counsel's perspective at the time the decision was made. *See Strickland*, 466

22

U.S. at 689. Thus, this Court must bear in mind that Dr. Foley's report, while a significant aspect of the sentencing record, was one of a number of factors presented at sentencing, including DeLuca's military record, employment and family history, otherwise law-abiding life, and voluntary cessation of his offense conduct well before his arrest. Given the overall favorable character of Dr. Foley's report—and, in particular, his conclusion that, notwithstanding the inconclusive Abel Screen results, DeLuca was a low risk for contact sexual offenses[9]—and given the other aspects of DeLuca's background highlighted at sentencing, this Court cannot conclude counsel acted unreasonably in failing to pursue the Abel Screen issue further with Dr. Foley.[10] The Court therefore finds DeLuca

_____

[9] Although there is a difference between the likelihood of committing a contact sexual offense and the likelihood of reoffending (i.e., committing another child pornography offense), the former issue is nevertheless highly relevant to sentencing in a child pornography case, and counsel could reasonably have regarded Dr. Foley's conclusion regarding the low risk DeLuca would commit a contact sexual offense, which was supported by other objective factors, as favorable to DeLuca.

[10] *Jacobs v. Horn*, 395 F.3d 92 (3d Cir. 2005), on which DeLuca relies, does not require a different conclusion. In *Jacobs*, the Third Circuit Court of Appeals held defense counsel in a capital case was ineffective during the guilt phase for "failing to investigate and present mental health evidence for the purpose of supporting his diminished capacity defense." *Id.* at 101-04. Although defense counsel had consulted a psychiatrist, who conducted a mental health evaluation of the defendant, counsel did not inform the psychiatrist his client was facing the death penalty (which would have led the psychiatrist to request certain additional testing automatically) and did not provide the psychiatrist with any background information concerning the defendant's crimes or personal history, including the fact the defendant had admitted to stabbing his girlfriend more than 200 times despite having no history of violence. When the psychologist orally reported he found no evidence of a major mental illness, counsel conducted no further investigation but nevertheless pursued a diminished capacity defense. The Court of Appeals concluded that, in light of the information known to defense counsel (but not provided to the psychiatrist), counsel's failure to investigate further was objectively unreasonable. DeLuca argues that, as in *Jacobs*, having sought a variance based on Dr. Foley's conclusion DeLuca posed a low risk for contact sexual offenses, defense counsel was required to investigate this conclusion further. In *Jacobs*, however, the psychiatrist's conclusion did not support counsel's chosen defense. Here, in contrast, Dr. Foley's conclusion regarding the risk DeLuca would commit a contact sexual offense did support defense counsel's argument for a variance (which was also based on other factors). *Jacobs* is also distinguishable in that there is no suggestion in this case that Dr. Foley's evaluation was not sufficiently extensive or that Foley was not provided with information essential to his ability to evaluate DeLuca. For these

23

has failed to show counsel's failure to investigate or to ask Dr. Foley to readminister the Abel Screen fell outside "the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

DeLuca also has not shown he was prejudiced by these asserted errors. DeLuca argues that, had his counsel conducted the additional investigation he contends Dr. Foley's report invited, his counsel could have presented testimony from Foley that "(a) he did not believe Mr. DeLuca had intentionally failed to follow the instructions for the Abel Screen; (b) the Abel Screen is not a good predictor of future criminality; [and] (c) even without valid Abel Screen results, he was confident that Mr. DeLuca posed a very low risk of reoffending." Def.'s Resp. to Gov't's Mot. to Dismiss 13 (citing Foley Decl. ¶ 4). DeLuca also suggests counsel may have been able to present this Court with favorable results from a readministered Abel Screen. *See* Def.'s Reply to Gov't's Opp'n to Mot. to Vacate Sentence 1-2. To establish the prejudice element of his ineffective assistance claim, DeLuca must show there is a reasonable probability this information would have led this Court to grant his request for a downward variance and to impose a below-Guidelines sentence. The assessment of prejudice "should not depend on the idiosyncracies of the particular decisionmaker, such as unusual propensities toward harshness or leniency"; however, this Court may consider evidence about the actual process of decision to the extent such evidence is part of the sentencing record. *Strickland*, 466 U.S. at 695.

Although DeLuca suggests there is a reasonable probability the question whether DeLuca attempted to undermine the reliability of the Abel Screen affected the sentence imposed, *see* Def.'s Reply to Gov't's Opp'n to Mot. to Vacate Sentence 2, the record refutes this assertion. At the sentencing hearing, this Court expressed concern regarding the invalid protocol DeLuca provided

─────────────────

reasons, this Court finds *Jacobs* inapposite.

for the Abel Screen insofar as it rendered the test results unreliable and therefore unhelpful.  *See*

Sentencing Tr. 49.  When DeLuca broached the subject of the Abel Screen during allocution, this

Court asked him why he rushed through the test.  *Id.* at 38.  DeLuca explained he did not find the

test images attractive and thus "hit a button to get [the images] off" and that he did not understand

he "was supposed to sit there and actually observe it, look at it and then, register it and then, decide

what I was gonna do . . . ."  *Id.* at 39.  The Court did not express any disbelief of DeLuca's

explanation or any concern DeLuca had intentionally tried to thwart the test.  Therefore, there is no

basis to conclude Dr. Foley's testimony on this issue would have had even a conceivable effect on

sentencing.

DeLuca argues the remaining evidence Dr. Foley could have provided, including favorable

results from a readministered Abel Screen, would have allayed this Court's concerns regarding the

initial Abel Screen and supplemented the opinion in Foley's report that DeLuca was at low risk for

contact sexual offenses with the further opinion he was also at low risk for committing another child

pornography offense.[11]  Although the sentencing transcript could be read to suggest this Court took

DeLuca's invalid Abel Screen results into account in declining to give much weight to Dr. Foley's

report, *see* Sentencing Tr. 49, the Court also expressed skepticism of Dr. Foley's ability to accurately

predict DeLuca's likelihood of future criminal conduct for reasons unrelated to the Abel Screen,

stating, "I cannot understand how the doctor would be able to foresee future criminal behavior

because the best indicator[] of future criminal behavior is past criminal behavior and certainly, this

---

[11] Insofar as DeLuca argues he was prejudiced because the Court did not have the benefit of Dr. Foley's opinion that the Abel Screen is a poor predictor of future criminality, the Court notes this opinion adds little to the statement in Foley's report that "[i]t is beyond the scope of [the Abel Screen] to determine if a sexual offense has or will occur."  Foley Report 5.

case is troubling to the Court," *id.* at 50. Given the Court's skepticism of the premise that Dr. Foley could foresee future criminal behavior based on psychological testing and evaluation, and the Court's expressed belief that past criminal behavior is the best indicator of future criminal behavior, it is not reasonably probable that favorable Abel Screen results or a new opinion from Dr. Foley that DeLuca had a low likelihood of reoffending would have led this Court to impose below-Guidelines sentence. This is particularly true given the emphasis the Court placed on the seriousness of the offense in denying DeLuca's variance request. In reviewing this factor at sentencing, the Court noted DeLuca had possessed child pornography "created through the sexual abuse and exploitation of minors" and that his conduct "promote[d] the market for child pornography on the Internet." *Id.* at 47. The Court also cited the large volume of child pornography DeLuca possessed, including more than 2,000 images and five videos, some of which depicted prepubescent minors and sexual penetration of minors. *Id.* After reviewing the mitigating factors highlighted by DeLuca's counsel, the Court concluded that "[g]iven the seriousness of the offense," the case was not one "which merit[ed] a downward variance from the [G]uidelines to accommodate Mr. DeLuca's needs." *Id.* at 50. In this context, and given this Court's skepticism of Dr. Foley's ability to predict future criminality, it is not reasonably probable additional evidence from Dr. Foley would have sufficiently altered the balance of information before the Court to result in a below-Guidelines sentence.[12]

DeLuca also argues his counsel was ineffective for not obtaining a further evaluation of

---

[12] The Court also notes that despite its skepticism of Dr. Foley's ability to predict future criminality, the record does not reflect that the Court believed DeLuca was likely to commit a contact sexual offense, as the Court specifically declined to impose, as a condition of supervised release, a prohibition against DeLuca obtaining employment or performing volunteer work which includes contact with minor children. *See* Judgment 4. The Court declined to impose this condition over the Government's objection that such a prohibition would be appropriate, in part because of the inconclusive Abel Screen. *See* Sentencing Tr. 41-42.

DeLuca—from Dr. Foley or another psychologist or psychiatrist—to identify why he committed his offense. DeLuca contends his counsel's failure to conduct this further investigation was objectively unreasonable because the Court was likely to take into account the reasons for the offense conduct in exercising its sentencing discretion and because Dr. Foley himself recommended that DeLuca "be referred for psychotherapy to further investigate his index offense behavior." Foley Report 6.

Information regarding the reasons why a defendant committed an offense is certainly relevant at the sentencing stage.[13] In addition to being part of "the nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), such information may assist the court in fashioning a sentence that provides the defendant with training or treatment aimed at reducing the risk of reoffending, as part of a prison term or as a condition of supervised release, *see id.* § 3553(a)(2)(D). However, the fact such information may be relevant in some instances does not mean defense counsel must be able to explain his client's conduct in every case, much less that counsel must seek a psychological evaluation in every case in which the defendant himself lacks insight into the reasons for his crime. *Cf. Watters v. United States*, No. 11-1181, 2011 WL 3563168, at *3 (C.D. Ill. Aug. 15, 2011) (holding the fact a defendant "lacked an answer regarding why she committed such a heinous crime d[id] not render her counsel's decision to forgo a psychological evaluation deficient performance,"

---

[13] Even when such information is available, it may not always be favorable to the defendant, and, even when favorable, it may or may not impact the sentence imposed. *See, e.g.*, *United States v. Miles*, 362 F. App'x 314, 319 (3d Cir. 2010) (affirming grant of a 10-month downward variance based on defendant's argument he committed bank robberies "because of mental health problems and a serious drug addiction"); *United States v. Richardson*, 335 F. App'x 258, 261 (3d Cir. 2009) (affirming denial of a downward variance in a child pornography case, notwithstanding defendant's submission of a psychological evaluation stating the offense was a product of the circumstances surrounding him at the time); *United States v. Davis*, 328 F. App'x 138, 142 (3d Cir. 2009) (affirming denial of a downward variance and sentence at the top of the advisory Guidelines range on gun possession charge where district court noted defendant's "uncontrolled mental disorders, criminal record, and weapon possession was a 'dangerous mix'").

where counsel feared such an evaluation could be used against the defendant at sentencing).

In this case, DeLuca was evaluated by Dr. Foley, who found him to be "a relatively well-adjusted individual with no measured psychopathology," who was possibly at risk of developing an anxiety disorder if incarcerated.  Foley Report 6.  Nothing in Dr. Foley's report suggested DeLuca suffered from some kind of psychological disorder that might explain his offense.  Although Dr. Foley recommended that DeLuca participate in psychotherapy to further investigate his offense conduct (and, presumably, the reasons therefor), this Court cannot conclude this treatment recommendation required counsel to obtain a further psychological evaluation of DeLuca for sentencing purposes.  Moreover, this Court implemented Dr. Foley's treatment recommendation requiring, as a condition of supervised release, that DeLuca participate in a mental health program for evaluation and/or treatment and "remain in treatment until satisfactorily discharged . . . with the approval of the U.S. Probation Office."  Judgment 4.

DeLuca also has not demonstrated his counsel's failure to obtain a further psychological or psychiatric evaluation prejudiced him.  DeLuca argues had his counsel pursued such an evaluation, he could have presented this Court with further opinion evidence that DeLuca (1) suffered from several previously undisclosed psychiatric disorders, the untreated symptoms of which "helped drive his criminal behavior," and (2) was at low risk of reoffending, in part because he does not meet the criteria for Pedophilia.  *See* Fiester Report 12-15.  Insofar as DeLuca argues he was prejudiced by not having the benefit of a second mental health professional's opinions regarding his risk of reoffending, it is not reasonably probable such information would have led this Court to impose a below-Guidelines sentence for the same reasons it is not reasonably probable additional evidence from Dr. Foley on this issue would have produced a lower sentence.  While evidence regarding

28

DeLuca's previously undiagnosed psychiatric disorders and the way in which these disorders may have contributed to his offense conduct would have provided some insight into the reasons for the offense, there is no basis on which to conclude this information would have sufficiently altered the balance of information before the Court to have resulted in a lower sentence, particularly in light of the significant weight this Court placed on the seriousness of the offense in finding a variance was not warranted.

For the reasons set forth above, DeLuca has failed to show his counsel's performance at sentencing fell outside the wide range of professionally competent assistance or that he was prejudiced by the asserted errors, and his § 2255 motion will therefore be denied on the merits. The Government's motion to dismiss will be denied as moot. Because this Court finds DeLuca has not made "a substantial showing of the denial of a constitutional right," 28 U.S.C. § 2253(c)(3), a certificate of appealability will not be issued.

An appropriate order follows.

BY THE COURT:

   /s/ Juan R. Sánchez        
Juan R. Sánchez, J.